(110 App. Div. 313.)

### HEYZER et al. v. MORRIS et al.

(Supreme Court, Appellate Division. First Department. December 30, 1905.)

WILLS—TESTAMENTARY CAPACITY—SUFFICIENCY OF EVIDENCE.

In an action to determine the validity of the probate of a will, evidence examined, and *held* to show testamentary capacity on testator's part.

[Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 144, 153.]

Appeal from Trial Term, New York County.

Action by Elizabeth R. Heyzer and others against Mary Ann Morris and others. From the judgment, and from an order denying a motion for a new trial, defendants appeal. Reversed.

Argued before O'BRIEN, P. J., and PATTERSON, CLARKE, INGRAHAM, and LAUGHLIN, JJ.

Arthur S. Tompkins, for appellants.
R. M. Moore, for respondents.

CLARKE, J. Appeal from a judgment entered upon a verdict, for plaintiffs in an action brought in the Supreme Court, under section 2653a of the Code of Civil Procedure, to determine the validity of the probate of the will of Charles H. Heyzer, deceased, and from an order refusing to set the verdict aside and grant a new trial. The question

of undue influence was taken from the jury by the learned trial court; the question of testamentary capacity alone being submitted.

Charles H. Heyzer was 63 years of age at the time of his death. For upwards of 30 years he had been employed in the custom house. He was a prominent and active mason, and had a very wide acquaintance. He was married to Elizabeth R. prior to 1867, and had by her seven children, five of whom survive. The widow and the five children are the plaintiffs in this action. The period during which the decedent and his wife lived together does not clearly appear from the evidence, but they separated many years ago. After the separation the testator boarded with a Mrs. Morris and her widowed daughter, Mary Ann, called throughout this record Polly. An intimacy between testator and Polly resulted in their assuming the relations of man and wife, which continued for at least 25 years, and until the time of his death. To his friends Polly was known as his wife. She was introduced as such, took part in social affairs as such, and was everywhere recognized as such. She lived with him openly, sustaining the relations of a dutiful wife. His father and mother were nursed by her in their last illness, and his father died in her arms. Their parents lived under the same roof with them. No children were born to them. Although his children by his lawful wife were adults over 30, he continued to contribute toward their support. He had no association with his daughters and very little with his sons, and to those who knew the facts expressed himself bitterly about the character and actions of his children. In December, 1903, Mr. Heyzer was taken ill with endarteritis, which manifested itself by a broken or plugged artery in the foot, which suppurated. On February 6, 1904, Mr. Heyzer requested Mr. Alfred E. Ommen, who was then a city magistrate, to prepare his will. Although for many years an intimate friend of Mr. Heyzer and Polly, Judge Ommen had no knowledge of the situation until Mr. Heyzer explained his marital condition on that day and directed that a will be made leaving everything to Polly. The will, drawn as directed, was brought to the house next morning, Sunday, February 7, 1904, and was executed between 10 and 11 a. m. in the presence of Judge Ommen his probationary officer, Scott, and an old friend of the family Mrs. Haight, who was assisting in the nursing of Mr. Heyzer. On the next (Monday) morning, February 8th, at about 2 a. m., Mr. Heyzer had a stroke of apoplexy, and died at about 7 o'clock in the forenoon.

The plaintiffs claim that at the time of the factum of the will the decedent did not have testamentary capacity. The jury, by its verdict, has so found. We are to consider whether or no that verdict is against the weight of the evidence. The probate of the will by the surrogate is made by statute prima facie evidence of the due execution and validity of the will, and the burden is placed upon the contestants of establishing the testamentary incapacity of the testator. In Hagan v. Sone, 174 N. Y. 317, 66 N. E. 973, the Court of Appeals set aside the direction of a verdict in favor of the will, saying, however:

"There was evidence in support of the allegations of the complaint sufficient for the consideration of the jury. The value and bearing of the evidence, as well as its construction, when not clear, was for the body to which is committed the decision of all questions of fact. * * *. Wills

are not to be set aside by juries, except for the gravest reasons. A person has the right to 'dispose of his property in such way and to such persons as he thinks best. It is only in a case where there is substantial proof of mental incapacity, or of undue influence, that courts or juries may annul his testamentary act. * * * The plaintiff's proof might not have satisfied the jury that the deceased was either incompetent to make a will or subjected to any undue influence, but there was enough of it to require us to hold that the jury was the branch of the court that the law required to pass upon it. Questions of fact arising in an action to determine the validity of a will are no different in this respect from questions of fact in any other case."

The same learned court said, in McDonald v. Metropolitan St. Ry. Co., 167 N. Y. 69, 60 N. E. 283:

"So long as a question of fact exists, it is for the jury and not for the court. If the evidence is insufficient, or if that which has been introduced is conclusively answered, so that, as matter of law, no question of credibility or issue of fact remains, then, the question being one of law, it is the duty of the court to determine it. * * * The credibility of witnesses, and the effect and weight of conflicting and contradictory testimony, are all questions of fact and not questions of law. If a court of review, having power to examine the facts, is dissatisfied with a verdict because against the weight or preponderance of evidence, it may be set aside, but a new trial must be granted before another jury, so that issues of fact may be ultimately determined by the tribunal to which those questions are confided."

In the case at bar there is no evidence whatever given by any witness who saw testator prior to the attack on Monday morning, which immediately preceded his death, as to any delusions or mental impairment. Of physical weakness there was proof. He was undoubtedly suffering from a fatal malady, as the event showed. The plaintiffs called Dr. Ellison, who was a practicing physician and surgeon, but did not attend testator professionally. He called socially on January 1st, and found a spot of wet gangrene on his left foot. He observed that he was suffering from a fatal disease, but that his mind was clear. He talked with him on masonic and other subjects, and he appeared thoroughly to understand. There was no evidence of septicæmia or blood poisoning on that day.

Dr. Sauvalle was the attending physician. He began treating testator on December 16th. He had endarteritis, an inflammation of the inner cores of the artery. He saw him every day until he died. Testator died suddenly, in his opinion, from a stroke of apoplexy at night. The brain was clear to the very end. Witness requested Mr. Heyzer to make his will two or three days before his death, because he found him a little weaker, and he knew how fatal the disease was. On the Friday before his death Mr. Heyzer's mind was perfectly clear. His talk was perfectly rational. He was of sound mind. The first indication of the trouble in the brain, the apoplexy or embolism, was on Monday morning at 2 o'clock. On Sunday morning, when he called, his pulse was about 90 and temperature 100. When he came at 2 the next morning, the pulse was 130 and very irregular; temperature 103; his arm paralyzed. He saw him Sunday at about 12 o'clock noon. His pulse was 90. Heyzer told the witness that he had finished his will. Up to 2 o'clock on Monday morning he had not been in an unconscious state, or semiconscious state, or state of coma during his illness. There was no sign of delirium on Sunday. He remained with him about 20 minutes; talked with him. His mental condition was good. His mind

was clear. He was of sound mind. His conversation and manner were rational. He did not notice any change in his condition from what it was the week before. There was no change at all in his mental condition Dr. Sauvalle said that before the surrogate he testified:

"Three or four days before his death I found the brain affected. And I thought his case was hopeless."

But explained that he did not mean that he was out of his mind at all; that he found his brain a little weakened; that, when he said "affected," he meant weakened; that his brain was clear to the very end; that he did not observe any impairment of mind on Friday; that he was not as bright as usual—jocular—but his mind was clear. Mrs. Smith testified she was in Mr. Heyzer's room at about 8 o'clock in the evening of Friday before his death, and said to him, "Good evening, Mr. Heyzer," and he never turned his head or answered. On cross-examination she said he might have been asleep.

Three physicians were called who had never attended the testator, who answered the hypothetical question framed by plaintiffs' attorney that the person pictured in that question was not, in their opinion, competent to make a will at the time in question. Such evidence is competent, of course, and its weight in the first instance is for the jury. The question, however, is always framed, assuming the facts most favorable to the side propounding it, and omitting the unfavorable facts. It is hardly necessary to add to what has so often been said as to the unsatisfactory character of such testimony when contrasted with the positive evidence of attending physicians and direct testimony of lay observers.

For the defendants Judge Ommen, who drew the will and was one of the subscribing witnesses, and was one of testator's intimate friends, had been associated with him in the custom house and in Masonic orders for years, and for two or three years had seen him every day, and had never known that Polly was not his lawful wife. He had spoken to testator several times about making his will. On the Saturday before his death Ommen called on him about half-past 8 in the evening, and after talking about an extension of leave of absence on account of his sickness, which he had obtained for him, the testimony proceeds:

"I said to him, 'Have you thought about that will, Charlie?' and then there was not anything said, I should think, for half a minute, or probably a minute, and then he turned to me and said, 'Al, I've been a damned liar to you.' I said, 'Why, Charlie?' And then there was not anything said for about a minute. He and I just sat there in silence, and he said, 'I'm not married to this woman, Al.' 'Well,' I said, 'have you ever been married before, Charlie?' He said, 'Yes.' 'Well,' I said, 'is the woman living?' He said, 'Yes.' I said, 'Did you have any children?' He said, 'Yes.' 'Well,' I said, 'what do you want me to do, Charlie?' Then there was a little lull for about, I should think, 15 seconds between him and me, and he turned to me and said, 'Al, I want this woman here to have everything I've got. She has been as true as steel to me for over 34 years, and I want her to have everything I've got.' I said, 'Well, how about your children, Charlie?' He said, 'No; I don't want to give them anything.' I said, 'What about all those medals that the fellows have been giving you?' 'Oh,' he said, 'give them all to Polly, and she will do what is right with them.' I said, 'Do you want me to draw a will along those lines?' and he said, 'Yes.' 'Now,' I said, 'I will go home and draw it.' So we had a little further talk, and I came out. He also told me he wanted to make Charlie Richards his executor."

The witness, having written out the will at his home that night, took it to Mr. Heyzer's house on Sunday morning beween 10 and 11. With him went his probationary officer, Scott. First, the will was read to Heyzer alone, and he said it was all right, and then Scott and Mrs. Haight were called into the room, and it was duly signed and declared. The other two witnesses gave corroborative evidence, and all testified that testator was of sound mind and free from restraint or undue influence.

Dr. Hartley testified that he was called in consultation by Dr. Sauvalle, and saw testator once about the 23d or 24th of January, about two weeks before his death. "His mental condition was good. He talked with me. It was normal. I think he was sound. There was no lesion of the brain when I saw him in January. I think he died from the original poison of the diabetes in an apoplectic attack with coma. My observation was that the man was in good condition when I saw him; mentally correct. At the time I saw him he was all right. Assuming that during all the day preceding the death of Mr. Heyzer he was bright mentally, his mind was active and rational in his conversation with friends who called, and that there was no rise in temperature until the next morning, and no increase in pulse until the next morning, and no coma or unconsciousness until the next morning, I think it would indicate that he was capable of transacting business that Sunday morning before his death. He might have gone into a coma and been perfectly sane; perfectly correct mentally up to within an hour or two of his death. The diseased condition that I found in his body is not inconsistent with complete mental faculties, he dying at 7 o'clock in the morning, and not inconsistent with complete possession of mental faculties on the Sunday evening preceding his death."

Matthews had half an hour's talk with testator at about 7:30 in the evening of Saturday February 6th—talked about Masonic affairs; and Heyzer told him where to find the rituals, and Matthews afterward found them at the indicated place. He asked Heyzer where he got the subject-matter for lectures that he had. He said:

"You get Pike's Book. That is my bible, and that is where I got all the matter from."

He explained what Pike's Book was, and where it could be found. He noticed no difference in his conversation that night. It was rational certainly.

Crawford had been a fellow clerk in the custom house between 25 and 30 years; called on him the Thursday night before his death. He was cheerful under the circumstances. His mind was clear and bright; talked about the work in the Scottish Rite.

Dr. Reynolds, an intimate friend of 20 years, saw him from the 1st of January to the time of his death 25 or 30 times; saw him on Saturday morning. "There was no change in his speech. He looked a very sick man. The conversation had with him that morning impressed me as being entirely rational. His mind certainly was not affected." He called again Sunday night before his death, between 7 and 8. "He extended his hand, and called me by name when I came in." He was entirely rational.

Palmer, who was in the same department at the custom house with testator for 15 years, saw him about 3 o'clock the Saturday afternoon before his death. He said he was not suffering as much pain as usual, and asked about the health of witness' wife, and in regard to the boys down in the office. The witness saw no difference in his manner, except he was quieter. His speech, appearance, and manner impressed the witness as being perfectly rational.

Roberts, an insurance broker and old friend, saw him Saturday afternoon and, was with him 15 minutes. The witness repeated on the stand quite a talk about Masonic affairs, and stated Heyzer was absolutely rational.

Lefevre saw him about 5 o'clock in the afternoon of Saturday, and talked with him 10 or 15 minutes. He was rational.

Blake, manager of a drug store, and intimate friend for 12 years, saw him about noon on Saturday for 20 minutes or half an hour; talked with him about a case he had in litigation—perfectly rational.

Duggan was there Saturday night and Sunday. Hays, intimate friend for 20 years talked with him Saturday morning about 10. Heyzer talked with him about some papers in his closet at the club, and sent him for them. He did not find the one Heyzer wanted the first time, but was sent back for it, and found it where Heyzer told him to look. Heyzer also sent him for flowers. "He was as rational as ever I seen him."

Mrs. Haight helped take care of testator for the seven weeks of his sickness, and detailed many occurrences, including the factum of the will and the check episode afterwards. "Mr. Heyzer's speech and his acts and conduct on those other occasions, those other days and nights about which I have testified, impressed me as rational."

Moore, a clerk in the Mercantile Bank, and a friend of 30 years, called at the house on Sunday afternoon, and talked with him for 15 minutes. Heyzer talked about the witness going to Dr. Ellison for treatment for himself. Heyzer also asked what date it was, and, being told, said to Polly:

"That check is due tomorrow. I guess you had better let me indorse it and have Steve cash it for you."

He did indorse it. "He told me to have the check cashed and give the money to Polly. He died next morning before the bank opened." He was perfectly rational.

Salomon testified that he had given the check to Heyzer in the early part of the month in payment of rent, dated ahead, the 8th of February. The check was produced, and other corroborative evidence completely established the incident.

This is most striking. On the Sunday afternoon before he died, after the making of the will, of his own motion, Heyzer suddenly asks the date, recalls that a check is dated the next day, asks for it, indorses it, and delivers it for collection. He is thus shown to have been able to recall his business affairs and transact them almost to the very end. So that it appears from the testimony that 14 different people, doctors, custom house officers, masonic friends, and old business acquaintances saw testator and conversed with him during the two last days of his life. No human being who saw him during that

period gives evidence of one irrational act, of a delusion, or of one fact which tends to suggest, much less to prove, testamentary incapacity. Every one of these witnesses testifies to the conversations held with him and to his soundness of mind. Nor do the provisions of the will itself shock the mind, so as to lend color to the suggestion of mental infirmity. The will, while it diverts the property from what may be called its natural channel, his lawful family, and bestows it upon the woman with whom for many years he had been living without the sanction of law, yet cannot be said to be unreasonable. He had been entirely separated from his wife for many years. The youngest of his children was 30 years of age. His daughters he never saw; his sons but seldom. This woman had been recognized by his world as his wife. She had been true and loyal, he said, for 34 years. She had devoted her life to him, and had been accepted by his parents. His last care was for this life companion, illicit though the relation was. We are not called upon to approve his morals or sanction his mode of life. The law, which alone we are to expound, is, that a man, irrespective of his moral character, being of sound and disposing mind, not moved by undue influence and not under restraint, may, if he observes the formalities of the law governing the execution of a last will and testament, dispose of his property as he will. The verdict rendered upon the evidence in this case was against the weight thereof, and must be set aside.

Judgment and order reversed, and a new trial ordered, with costs to appellants to abide the event. All concur; PATTERSON, J., in result.